IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER (850) 240-1784 THAT IS STORED AT A PREMISES CONTROLLED BY AT&T | Case No. 5:20mj86-MJF<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Leon Saddler, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with a certain cellular telephone, hereinafter referred to as the Subject Phone, assigned call number (850) 240-1784, that is stored at premises controlled by AT&T, a wireless telephone service provider headquartered at 11760 US Highway 1, STE 600, North Palm Beach, Florida, 22408. The Subject Phone was assigned the phone number (850) 240-1784 and was subscribed to Giovanna Alvarez ("Alvarez") between January 1, 2020, and May 21, 2020. On or about May 21, 2020, your affiant seized his cellular phone from Alvarez after obtaining a warrant from a military magistrate at Tyndall Air Force Base. Your affiant does not seek authorization to search the contents of the Subject Phone. The information to

be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) to require AT&T to disclose to the government copies of the information further described in Attachment B. I have been informed by another law enforcement officer that AT&T is required keep such records for a period of one year. Consequently, I believe AT&T still has the records I am requesting.

2. Your affiant is an investigative and law enforcement officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Titles 18 and 42 of the United States Code. Since May 2019, your affiant has been a Special Agent with the Air Force Office of Special Investigations ("OSI"). Your affiant is currently assigned to the OSI Detachment 223 at Tyndall Air Force Base (TAFB), Florida which is located in Bay County, Northern District of Florida. Your affiant received a Bachelor's of Arts in Communications from the University at Albany in 2012. Your affiant is currently pursuing a Master's degree in Business Administration from Florida State University, which is scheduled to be completed in 2021. Additionally, I received training to be an OSI Special Agent at the United States Air Force Special Investigations Academy (USAFSIA) and the Federal Law Enforcement Training Center (FLETC) located at Glynco, GA. While at FLETC, I attended the 11-week Criminal Investigator Training Program, where I was trained in various federal law

enforcement techniques and civilian law. I then attended the eight week AFOSI Basic Special Investigators Course, where I was trained in various OSI techniques and military law, including the execution of search warrants.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on the facts set forth in this affidavit, there is probable cause to believe that a violation of Title 18, United States Code, Section 641 (Theft of Government Property) has been committed by Giovanna Alvarez. There is also probable cause to believe that Giovanna Alvarez aided and abetted Darien James to take Government owned property from the Tyndall Air Force Base on January 24, 2020 and January 25, 2020.

## PROBABLE CAUSE

5. Giovanna Alvarez ("Alvarez") was indicted by a federal grand jury on August 4, 2020, with one count of Theft of Government property, in violation of 18 U.S.C. § 641. Alvarez and her co-Defendant, Cody Sekela ("Sekela"), were tried before a federal jury in October 2020 in Tallahassee, Florida. While the jury convicted Sekela, the jury hung as to Alvarez and a mistrial was declared. Alvarez is to be tried again on November 30, 2020. Alvarez's case is related to the case of

Dairian James ("D. James"). D. James previously pled guilty to the Theft of Government Property, and cooperated against Alvarez at her trial. According to D. James, Alvarez authorized him and his father, Stefron James ("S. James"), to take a number of items of property that belonged to the U.S. Air Force. According to D. James, he, Alvarez, and Sekela also scouted locations on Tyndall Air Force Base to steal property.

6. D. James testified that between July 2019 and January 2020, Alvarez stole an elliptical machine, a treadmill, furniture, generators, a foosball table, and paint sprayers and transported many of these items to her father, Carlos Alvarez, in Miami. According to D. James, Alvarez told him that she had transported these items to Miami, where her father and children lived. Carlos Alvarez also testified at trial, and while he admitted that he received a few damaged generators from Alvarez, he stated that he never received a foosball table from her.

7. S. James also testified at Alvarez's trial. S. James had also been charged with Theft of Government Property at the same trial, but was later acquitted. S. James' defense was that Alvarez had authorized him to take the property that he was charged with stealing. S. James testified that on June 24, 2020, he and his son, D. James, met Alvarez at Tyndall Air Force Base, which is located near Panama City, Florida. According to S. James' testimony, Alvarez met him and D. James at a building which contained recreational equipment. Because the equipment looked

new, and did not appear damaged, S. James specifically asked Alvarez whether it was okay to take the equipment. Alvarez informed S. James that it was okay for him to take the equipment because the building containing the recreational equipment was going to be destroyed and the equipment would be thrown out. This, in fact, was not true based on a number of Air Force personnel that testified at trial, including Sergeant Randy Aikens. According to Aikens, the equipment was either brand new or relatively new, and there was no intention to destroy or throw-out the equipment, and that Alvarez had no authority to allow other individuals to take equipment from the building.

8. According to S. James. Alvarez specifically told him that they could take a pool table, foosball table, and ping-pong table. The equipment, according to Sergeant Aikens, had a cumulative value far in excess of $1,000. According to S. James, Alvarez asked that she be given the foosball table. According to the testimony of both S. James and D. James, Sekela was also present, and asked that he be given a ping-pong table that was located in the building. S. James and D. James then loaded the pool table, foosball table, and ping-pong table onto a trailer attached to S. James' truck and transported it to the residence of Sekela. S. James and D. James both testified that they met Sekela and Alvarez at Sekela's residence, and unloaded the foosball table and ping pong table. S. James and D. James then took the pool table to D. James' residence.

9. In terms of background of the investigation, on February 2, 2020, OSI became aware of several thefts that had occurred at Tyndall Air Force Base. In particular, OSI had received a complaint that there were industrial cabinets that were missing. These cabinets were valued by the Air Force in excess of $30,000. OSI then acquired limited footage from the gate at Tyndall Air Force Base which showed S. James' truck departing with a trailer containing a pool table, ping-pong table, and a foosball table. This footage was from the evening of January 24, 2020. Directly behind the truck, the CCTV captured a motorcycle, with a helmeted rider. Although the video is somewhat grainy, the motorcycle was identical to one owned by Cody Sekela, who was a known friend of D. James. S. James and D. James later testified at trial that the helmeted rider was in fact Sekela.

10. Additional footage was acquired for the evening of January 25, 2020, and it showed S. James truck departing Tyndall Air Force Base with the reported missing industrial cabinets in an attached trailer. These cabinets were then taken to Sekela's residence, where they were divided between S. James, D. James, and Sekela. S. James later testified that he and D. James returned to Tyndall Air Force on January 25, 2020, to take the cabinets. Because the cabinets looked in good condition, S. James asked D. James to verify with Alvarez that it was okay for them to take the cabinets. According to S. James, he witnessed D. James text Alvarez, who, according to S. James, confirmed that it was alright to take the cabinets. Your

affiant has previously received Alvarez's phone tolls, and these tolls do not contain a record of such a text. Consequently, you affiant cannot confirm whether S. James was telling the truth, or whether he was making a self-serving statement. D. James did not recall ever texting Alvarez, but stated that he had previously spoken to Alvarez about taking the cabinets. D. James stated that Alvarez was not present on January 25, 2020, when he and S. James took the cabinets.

11. According to S. James, once he learned that the property was unlawfully taken, he immediately returned all of the property to his son. This included 2 ATVs, a golf cart, a riding lawnmower, and some industrial cabinets. D. James stored the property in two storage units. Your affiant confirmed that D. James rented two storage units on February 6, 2020.

12. On February 26, 2020, a federal search warrant was executed at the residence of D. James, and various items of Air Force property were recovered. On April 29, 2020, Kaitlin James ("K. James"), the wife of D. James, came to the OSI Office at Tyndall Air Force Base, and stated that she wanted to give a statement. K. James thereafter rendered a sworn statement in which she stated that she was aware that Alvarez had directed and aided her husband to steal Air Force property. She stated that she was upset after she had read a newspaper article implicating only her husband and father-in-law (S. James).

13. K. James stated that she overheard many phones calls from Alvarez to her husband after the criminal investigation began in early February 2020. She stated that during many of these calls, Alvarez sounded inebriated, and that Alvarez asked her husband to take the entire responsibility for the thefts to "protect her and her family." K. James heard Alvarez promise D. James that she would write him letters of recommendation and that she would help find him a job if he was separated from the Air Force. K. James also texted Alvarez in April 2020, and accused her of ruining her husband's career, and asked her to take responsibility for her involvement. K. James provided a copy of the text to law enforcement. Alvarez never responded to K. James' text, but did later forward it to D. James.

14. K. James also stated that approximately two weeks prior to the search warrant being executed at her residence (February 26, 2020), she and her husband were sleeping when Alvarez called in the very early morning. According to K. James, Alvarez was frantic, and asked that D. James to meet her father, Carlos Alvarez, because he had driven up from Miami to return the foosball table due to the law enforcement investigation. This foosball table was found in D. James' shed during the search warrant. D. James later confirmed the information provided by K. James, and stated that he had received a phone call from Alvarez, and then met Carlos Alvarez in a residential neighborhood to acquire the foosball table. He stated

that Carlos Alvarez had driven-up in a Toyota Tundra, and that there was a child with him. D. James took the foosball table and stored it in his shed.

15. Based on information supplied by K. James, OSI became aware that Alvarez may be involved in the thefts. On May 11, 2020, in order to ascertain Alvarez's involvement in the thefts, your affiant falsely informed Alvarez that there would be a search warrant executed at Sekela's residence. Your affiant wanted Alvarez to believe the information was true, and that the information was being extended as a courtesy to Alvarez because she was within Sekela's chain of command. Based on a review of Alvarez' phone records, Alvarez immediately telephoned Sekela after the meeting. During Alvarez's trial, Alvarez initially denied calling Sekela, but then admitted that she called him to inform him that if he was stupid enough to have any Air Force property at his residence, he should get rid-off it. She testified that she was just looking out for people that worked for her.

16. On the evening of May 11, 2020, based on surveillance from a nearby business, an individual in a truck matching the physical description of a truck belonging to Sekela could be observed dumping industrial cabinets in various locations near Kraft Avenue in Panama City. These cabinets were stolen from the U.S. Air Force. Although Sekela cannot been seen on the video as it was dark at the time, D. James testified that Sekela confirmed he had gotten rid-off the cabinets that they had previously stolen. Your affiant believes that Alvarez tipped Sekela off,

who then discarded much of the property that he had stolen from Tyndall Air Force Base.

17. In July 2020, D. James cooperated with law enforcement and gave a statement. D. James stated that Alvarez was approximately a minute ahead of S. James' truck as they (S. James and D. James with Sekela following on his motorcycle) departed with the recreational equipment on January 24, 2020. OSI had only received approximately 30 seconds of the video from January 24, 2020, and Alvarez's vehicle, which your affiant knows is a silver SUV, was not observed on the video. Based on D. James statement, OSI attempted to get more video from the gate at Tyndall Air Force. The video was no longer available and had been recorded over. During her trial, Alvarez denied being at Tyndall that evening, and testified that she was at home drinking. Your affiant was able to recover some video from the gate across Highway 98, which shows a blurry image of a silver SUV leaving approximately one minute ahead on D. James truck, which had the recreational equipment in its trailer. However, your affiant cannot state with certainty that the SUV on the video is the same as Alvarez' vehicle, although it does provide corroboration to D. James' statement.

18. As he was cooperating in July 2020, D. James informed law enforcement that he had stored property that his father returned in early February 2020. He took law enforcement to the storage units and various Air Force property

was recovered, included 2 ATVs, a riding lawn mower, a golf cart, and industrial cabinets. D. James claimed that he did not immediately return the stolen property to law enforcement based on the advice of his military lawyer.

19. Your affiant seeks Alvarez's cell tower/sector records to ascertain her location on the evening of January 24, 2020. Based on the sworn statements of S. James and D. James, Alvarez was present and was only a minute ahead of them as they departed Tyndall Air Force Base with stolen property. Your affiant has attempted to secure means of evidence to prove Alvarez was present, but to no avail. You affiant attempted to secure additional video, and was unable to acquire any such video. Your affiant also attempted to acquire government computer usage records, but was informed that the information was no longer available. Your affiant did secure evidence to indicate that Alvarez was present at Tyndall Air Force Base on January 24, 2020, but this evidence can only show Alvarez was present during the early day-time hours, and this evidence does not keep a record as to what time Alvarez would have left the installation. Your affiant knows that if in fact Alvarez was home drinking as she claims, her phone would likely be pinging off a different cell tower based on the location of Alvarez's apartment at that time, which was approximately a fifteen minute drive from Tyndall Air Force Base.

20. In my training and experience, I am aware that AT&T is a company that provides cellular telephone access to the general public. I also know that

providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

21. Based on my training and experience, I know that AT&T can collect cell-site data about the Subject Phone. I also know that wireless providers such as AT&T typically collect and retain cell-site data pertaining to cellular phones to which they provide service in their normal course of business in order to use this information for various business-related purposes.

22. Based on my training and experience, I know that AT&T also collects per-call measurement data, which AT&T also refers to as the "real-time tool"

("RTT"). RTT data estimates the approximate distance of the cellular device from a cellular tower based on the speed with which signals travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

23. Based on my training and experience, I know that wireless providers such as AT&T typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service.

## AUTHORIZATION REQUEST

24. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

25. I further request that the Court direct the Provider, AT&T, to disclose to the government any information described in Attachment B that is within its possession, custody, or control. Because the warrant will be served on AT&T who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

26. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. I am seeking this information to impeach the testimony of Alvarez and the disclosure of this information would permit Alvarez to change or form her testimony. I request that it remain sealed no more than 30 days.

27. Pursuant to Fed.R.Crim.P. 41(d)(3), your affiant requests that this affidavit be sworn over the telephone because he will be unavailable to personally appear before the Court.

Respectfully submitted,

_____
Leon Saddler, Special Agent
Office of Special Investigations
Department of the Air Force

Telephonically subscribed to and sworn before me on this 23rd day of November 2020.

/s/ Michael J. Frank
_____
MICHEAL J. FRANK
UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT A

## Property to Be Searched

This warrant applies to records and information associated with the cellular telephone assigned call number (850) 240-1784, that is stored at premises controlled by the Provider, AT&T, a wireless telephone service provider headquartered at 11760 US Highway 1, STE 600, North Palm Beach, Florida, 22408.

# ATTACHMENT B

## Particular Things to be Seized

**I.     Information to be Disclosed by the Provider**

1.     To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period of January 24, 2020 to January 25, 2020.

    a. The following information about the customer or subscriber of the Account:

        i. Names (including subscriber names, user names, and screen names);

        ii. Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses) associated with the subscriber of the account;

iii. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Subject Phone, including: the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

iv. information regarding the cell tower and antenna face (also known as "sectors") through which the communications were sent and received as well as per-call measurement data (also known as the "real-time tool" or "RTT" data).

**Information to be Seized by the Government**

All information described above in Attachment B constitutes evidence of violations of Title 18, United States Code, Section 641 (Theft of Government Property) during the period of January 24, 2020 to January 25, 2020.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.